Judge Kelly. Good morning, Judge Erickson. My name is Matthew Kantor. I'm with the law firm of Constantine Cannon. My colleague Richard Horn is here with me. He's with the law firm of Fox Galvin. We represent Plaintiff Appellant Park Irmat Drug Corporation, which I will refer to as Irmat today. There's a few points I'd like to make today for emphasis. The first point, Your Honors, is that this is a pleadings motion. Rule 8 applies. All Irmat need plead is a short and plain statement of the case in its complaint. And that's true not only under the common law causes of action that it asserts, but under the antitrust causes of action as well. Tuomly itself says there are no heightened fact pleading requirements in an antitrust case. Page 570, we do not require heightened fact pleading of specifics. Now this is important here because the overwhelming amount of cases relied upon by the appellee in its briefs are not pleadings cases, but they're merits cases, summary judgment cases, trial cases, post-trial cases, cases that are in apposite to the procedural posture of where we are right now. Secondly, Your Honor, I want to talk about the structure of Express Scripts. This case concerns mail order pharmacy competition. Paragraphs 1, 2, 18, and 33 of the complaint identify that Express Scripts owns a mail order pharmacy. It owns and operates one. And in fact, this is the only mail order pharmacy by PBM rule, by Express Scripts rule, and by the allegations of the complaint that is permitted to sell in Americans. This infects Express Scripts with a conflict of interest. At the same time that it's managing thousands of pharmacies, it's potentially competing with them. It has an incentive to foreclose competition from them to ensure that the profits of its mail order pharmacy are robust. Secondly, on this point, its co-conspirator PBMs also are not only PBMs, but own and operate mail order facilities. They have the incentive, too, to foreclose competition, either by unilateral or conspiratorial means. Now, it's also relevant this point to why Express Scripts would foist upon so many pharmacies, thousands of them, a contract of adhesion via unconscionable means, and I'll get to that in a second. The third point that I'd like to talk about today, Your Honors, concerns the issue of novation. We have alleged that the contract that was imposed upon EIRMAT in 2014 was novated in 2015. The standard for novation is in the health services case, health-related services case that we set forth below in our briefs, or set forth in our briefs, as well as the Smith case. This is under Missouri law. Under Missouri law, you are to look at the attendant circumstances and conduct of the parties to determine whether a novation occurred. It's a quintessential factual issue. But fact findings were made. You're supposed to look at, by the way, the objectively reasonable. What would an objectively reasonable person think when the conduct occurred? And there you can look at the Visiting Nurse Association of St. Louis case, 347 F. 3rd, 1052, 8th Circuit, 2003. So here, what would EIRMAT have thought? Would a reasonable person have thought that the contract was novated? Now, the court below made a factual finding, an impermissible factual finding, concerning the documents that were attached to the complaint about what they meant. So I would like to talk about those facts and those documents. If Your Honors have in front of you the joint appendix, I'd like to refer you to certain pages there. Page JA-47. Page JA-47 is the credentialing form that was provided by Express Scripts to EIRMAT. This is an electronic form. They spent a lot of time putting this form together, obviously. And on this form, they asked certain questions. If you look at page JA-51, this corner of that page says, Indicate the anticipated percentage of RX volume in each setting, prescription volume that you intend to sell in each setting. And on the right side of that page, it identifies various channels through which you could sell those prescriptions, the pharmacy. One of them is mail order. EIRMAT checked the mail order box and put in 65 percent. It anticipated that 65 percent of its sales would be by mail order. Now, this came, this form, to us in 2015, and we responded to the form in July 2015. We, I mean EIRMAT. That's who I'm referring to. But the 2014 agreement expressly prohibited mail order, correct? Or in the definition of retail pharmacy, excluded mail order. It did, but obviously mail order to some extent must have been permitted because this was asked on this form, okay? So when we responded to it, and then we were given the fateful email, which we'll get to, which said that you are approved to continue to be in the Express Scripts networks, multiple networks, not singular, not just a retail network, but obviously a mail order network as well. There must have been a mail order network because Express Scripts was in it. Maybe it was a network of one, but they were in that network. That obviously novated the terms of the agreement. Well, at the novation, don't you also have to have an extinguishment of the previous contract? In our view, this was an extinguishment of the previous contract because new obligations were agreed to here. In other words, they were saying you can now go forth and mail. And they did not tell us that we were in breach with respect to the agreement for the previous nine months. So that's enough for an extinguishment of the prior agreement? I believe that is enough for an extinguishment. Again, it comes down to the attendance circumstances, Your Honor, and the conduct of the parties thereafter. I'll also say that nine months following the receipt of the email that I want to get to again, they were reimbursing, Express Scripts was reimbursing EIRMC for the claims that it was making. It didn't say, wait a minute, these are mail order claims, you're terminated. Not until nine months later did that occur. And in fact, on paragraph six of the complaint, we identify that for the year prior to termination, tens of millions of dollars in revenue was provided to EIRMC from its mail order sales by Express Scripts. Now, just completing the form, JA-51, where we are, below it also asks if mail order, does the pharmacy conduct mail order locally, out of state, or both? Here, we said that 95% of the sales that we were providing by mail order were out of state. So this was not a buried disclosure. These were not disclosures written on a paper napkin that was thrown in the sewer. We were responding to specific questions that Express Scripts was providing, proposing to EIRMC. And what happened in response to that? When you're saying proposing, you're suggesting that there was a proposal for a change in the contract. Isn't it just a gathering of information for the reaccreditation? This was a gathering of information for reaccreditation. At this point, we had no idea what was going to come thereafter. I agree with that. But we responded truthfully, and these were not buried disclosures, is my point. The other thing I'll say about the 2014 contract, in order for the 2014 contract to have force for us to have been in breach of it, it would have to not be unconscionable. And I'm going to get to the point as to why the facts demonstrate, at least, that there should not have been a factual finding that it's not unconscionable, because the allegations that we have made comport with Missouri law. But getting to the fateful email, as I said, that's JA-77, Your Honors. On JA-77, so the credentialing information that was gathered, as Judge Kelly identified, that was provided to Express Scripts was given in July of 2015. On August 7, 2015, an email is sent to EIRMC from Express Scripts that says the following, we are pleased to inform you that your recently submitted credentials have been reviewed, have been reviewed, and you are approved to continue in the Express Scripts holding company pharmacy networks, plural. Now the district court below on page 23, footnote 9, says that, made a factual finding, again an impermissible one, but also an incorrect one. It said that, quote, the point of the credentialing information in the application was accepted. But this email doesn't say your information was accepted. It doesn't say we hereby acknowledge receipt of your information. It says we reviewed it, and based on our review, you're approved to continue to be in these networks, plural. Again, what would an objective, really reasonable person have thought on receipt of this email after making those disclosures? That's the key. It's a factual issue and it should be reverted to the district court so those factual findings can be made by a fact finder. Fourth, the network provider agreement is unconscionable. To determine whether an agreement is unconscionable, you look at the Brewer case, which is Supreme Court of Missouri law, and there are four factors to consider there. First, was high pressure exerted during the contractual, I would call them negotiations, but they're not really negotiations, the contractual process, the contractual formation process. So I'd like you to look at page JA-79. JA-79 is the cover page to the contract that was sent to EIRMC in 2014. So is the pressure that you're asserting happened just simply in the communications paper-wise in presenting this contract and saying, look, if you don't sign it, it's done. Is that the pressure? That is the pressure. The pressure here says if you don't sign the contract, you'll be in breach. Not only that you'll be done, but you'll be in breach. And it says, it goes on to say, and by the way, that's in bold and in underlined. It says, if your pharmacy fails to complete and return the required network provider agreement by November 10, 2014, within two weeks of receiving this document, your pharmacy may receive a breach notification. It then says, this will be your pharmacy's last opportunity to comply with our request to return the provider agreement and avoid patient disruption. Your patients are going to be disrupted if you don't sign this contract. I think that's heavy-handed tactics. I certainly think it raises a fact issue. Secondly, was the contract non-negotiable? Paragraph 41 of the complaint, we say, the agreement was drafted entirely by Express Scripts and EIRMC was given no opportunity to negotiate its terms. That has to be accepted as true on a pleadings motion. Thirdly, was there unequal bargaining power? Paragraph 17 of the complaint identifies that 97% of the retail pharmacies in this country are members of the Express Scripts network. Paragraph 74 through 78 of the complaint identify that Express Scripts has market power, that it made up, it was the largest PBM in the country, and it made up 65% with CVS of the contract at the time that it was terminated. There was unequal bargaining power here. That standing alone, is that sufficient? It seems like just about every contract I sign, I don't have equal bargaining power with the company or business that I want to deal with. It's one factor out of the four factors. I don't think every contract that I sign or, Your Honor, I would submit that you sign, you have unequal bargaining power in. You make a choice as to whether or not you need to sign that contract. Maybe you signed a contract to use Amazon, but you don't have to use Amazon. You can use Walmart. Here, the question is, did they need Express Scripts to stay in business? The market power assertions say they absolutely did. Could they use the other PBMs? They couldn't. I can tell you this is not in the factual record. The entity has gone out of business after the termination of Express Scripts. They needed Express Scripts. Relying on the other PBMs was not sufficient. Express Scripts admission was necessary for them and a lot of Americans. The last item here, Your Honor, were the terms one-sided. This contract purported to provide Express Scripts with the ability to engage in mail-order pharmacy sales, but not ERMAT. It also had a one-sided unilateral termination provision. They could terminate without cause, but ERMAT could not. This was an unconscionable contract. The facts suggest that. Fifth, the conspiracy allegations. Antitrust conspiracy allegations are made here. In order to get past pleadings practice, a complaint that raises conspiracy allegations must show a non-negligible probability that the claim is valid. That's what plausibility means. It's a minimal threshold. That comes out of the text messaging antitrust litigation decision that Judge Posner issued, where he affirmed the denial of a motion to dismiss. What do you have to do to show conspiracy allegations are robust? Two things. Is there parallel conduct and was there plus factors that would allow for the court to make an inference of conspiracy? What is the parallel conduct? You've got a similar result, termination, but what have you got that's parallel? You've got CVS and Express Scripts. Those are the two really that are alleged here. Good question. In order to have parallel conduct, you don't need to have identical conduct, nor does it need to be at the same exact time. If you look at the SD3 case out of the Fourth Circuit, which reversed a motion to dismiss, I believe in 2015, maybe 2016, I might get the date wrong, but the reality was there, that had to do with a new developer of power tools, power tool technology. Some of the entities wanted to deal with the power tool entity at the beginning. Some of the co-conspirators said, I'm not dealing with them at all. They had various different responses, but it was deemed to be parallel conduct when they all terminated. If you look below in the district court, where in the PrecisionRx case and the HM Compounding case, these were the compounding cases, they identified various different conduct that led to an inference of conspiracy. Abusive audits. But those were in those cases. What about this one? This case has the same allegations. Paragraphs 88 through 92 of the complaint. The exact same? Exact same allegations. We say abusive audits. They've told members of their members not to frequent various pharmacies. They've terminated pharmacies. On paragraph 49 of the complaint, we identify that Express Scripts finally and fully terminated EIRMAT on August 22, 2016. Paragraph 93 of the complaint says eight days later, eight days later, EIRMAT gets a note from CVS slashing its reimbursement. Four months thereafter that, CVS finally terminates EIRMAT. Lastly, I just want to say you also have to plead plus factors. A description of the plus factors is very well stated in the text messaging antitrust litigation. Did you show concentrated market? We've said here four PBMs make up 80% of the sales. Did you show a conduit through which conspiracy could happen? Here we say that Express Scripts, CVS, and the other PBMs are on a trade association board. They control it through which they could have had discussions. Did you show a common motive to conspire? We've already talked about that. Did you show that or could you show that there were actions taken that were against self-interest? To the extent that Express Scripts, the PBM, had an incentive to provide low cost, high quality competition or high quality mail order pharmacies to its membership, it should have wanted to deal with EIRMAT. EIRMAT, according to paragraph 38 and 39, was not only licensed in 50 states and the D.C. Circuit, the District of Columbia, to provide pharmacy services, it also had the highest third party accreditations in the industry. With that said, I'd like to reserve the rest of my time for rebuttal. Thank you, Your Honors. Very well. Mr. Mussoff, you may proceed. Thank you, Judge Wolman. Good morning, Your Honors. Scott Mussoff from Scott and Arb's Fair, the Express Scripts Defendants. As the district court properly recognized, this case boils down to plaintiff's blatant violation of express contractual terms and defendant's exercise of express rights under that contract. That's the 2014 agreement, Judge Kelly, you referred to. Plaintiff now takes that contract activity and tries to create an antitrust claim out of the lawful and valid termination of this one pharmacy for its blatant disregard of the provisions of the 2014 contract. Your Honor, perhaps I'll start that way with the antitrust claims, because that's where my friend ended. As this court recognized, you need to show not only parallel conduct but plus factors. Judge Kelly, the parallel conduct you referred to is not parallel at all. In fact, it's inconsistent with parallel conduct. Do you agree that it's the same allegations that were in the compounding case? We call them all the compounding cases, but precision, RX, compounding, and Grasso. No, Your Honor, they're not. First, I would respectfully submit that I believe all three of those cases were wrongly decided, but the allegations there are very different. Plaintiff here tried to pick pieces of those, arguing that Express Scripts was part of a trade association, but in the compounding cases, there were very specific allegations that following specific meetings, I think they identified three specific trade association meetings, the members all acted in concert to change their existing policies. That's not what happened here. Is that kind of a combination of a plus factor and parallel conduct? It is, but it's the temporal nature of it that they changed their policies following those meetings. Here, the policy was always no mail order, and they don't dispute that the original contract is not violative of the antitrust laws. So the fact that we started with no mail order, they violated the contract once that was discovered. Express Scripts has 70,000 pharmacies. Once it uncovered the fact that they were violating the contract, it informed them of that, gave them the right to appeal, offered cease and desist. They didn't cease the mail order, and then they were terminated. On the other hand, following the notice, the cease and desist letter, months later, CVS enters into an agreement with Park Hermat that requires them to do mail order. It's the exact opposite of parallel conduct. What was the agreement with CVS before that? Was there another agreement? It's not clear from the complaint, Your Honor, but even if they were doing mail order with a cease and desist letter, requires them to sign another agreement that requires them to do their own mail order, not only renders any conspiracy not plausible, but it's inconsistent with a conspiracy. What is your response to the assertion that when Express Scripts wanted to cut them out of mail order, that that actually was against Express Scripts' financial well-being, that that was against their financial interest? Your Honor, there are no factual allegations in the complaint whatsoever to suggest that that was against Express Scripts. If you're looking at sort of Aspensky, for example, short-term profit, they didn't forego any short-term profit. There's no allegations that they weren't charging less for their mail order business than Park Hermat was. Again, Express Scripts from the very beginning prohibits mail order for various reasons. The fact that these designer dermatological drugs are expensive, they're selling them all over the country through mail order, they're giving 90-day renewals instead of 30-day renewals, there are lots of legitimate reasons for why you do not want pharmacies like Park Hermat to engage in mail order. In addition, even if, I would say in addition to those valid reasons, there is no, under So in other words, on day one, there's no requirement that Express Scripts has to do business with Park Hermat at all, let alone that it has to do business with them by allowing them to do mail order. That's Curtis Trinko. They try and rely on the one exception to Curtis Trinko, which as the Supreme Court said there, is the outer bounds, Aspensky, which is entirely different because in Aspensky, one, it's the outlier case, but there they were doing business for a long period of time, the main mountain, under the ski pass that applied to all the mountains, and then for no legitimate business reason, and in fact it was alleged there and shown that it hurt their short-term profits by canceling the program only to have a long-term anti-competitive aspect, and that's the outlier. So I think here, it began with no mail order, so they were never under this long-standing practice. Two, there are no factual allegations. The best they can come up with are allegations that they think they provided better service than Express Scripts did through its mail order pharmacy, but that's nothing more than the recitals and labels and other things that Twombly says is not enough to state a claim. You know, I'm not really sure I understand exactly what EIRMAT's argument is, but as I was looking at it, I kept coming back to the thought that on that particular issue that they were really trying to argue that Express Scripts was somehow trying to leverage their market power in the PBM market as a PBM into another market, that's the mail order pharmacy thing, and they're trying to draw some analogy to Aspen, and it seemed a bit strained, and I'm just wondering, first of all, have we ever, as a circuit, recognized this kind of leveraging theory? Judge Erickson, no. I agree. What's awkward about their trying to, it's sort of fitting the proverbial square peg into a round hole here. In terms of, they seem to be suggesting that there's some single brand market, that perhaps Express Scripts' market should be providing to its customers, but then what gets even more confusing is Park EIRMAT views the customers as the people that are walking into their pharmacy, or here, people that are submitting mail orders, when Express Scripts' customers are actually the health plans themselves, the third party payers. And then, on top of that, they ignore the interchangeable products, the fact that these health plans could switch PBMs, some of them have multiple PBMs, plaintiffs do not and cannot allege that that's not the case. They don't allege that individuals can go out of network and still use their mail order. They don't allege that it's not interchangeable, because just like in the Humana case, people can pick and choose their health plan every year. So, they try and fit the square peg into the round hole by citing the Kodak case. In Kodak, very different situation, where one, here we have no aftermarket, it was all done at the same time. When you sign up for a plan, the plan signs up for the PBM, it's fully aware of it. But also, significantly, there's no lock in here, where in Kodak, people bought very expensive copy machines, very expensive equipment. Then, they find out after the fact that the only way they can get replacement parts is doing it through Kodak. That is not the case here. Does it matter who the customer is here, whether you're talking about the insurance plan, or you're talking about the person you described is walking in off the street to get their prescription drugs. It seems, what do they call it, switching costs or something? The costs seem different for the individual consumer versus the plan, in terms of moving around to different networks to get what they need through mail order. I think, Judge Kelly, either way, whether you view it as the end-end customer or the plans, these are renewable contracts. So, nobody is locked in or tied in to Express Scripts as the PBM. Either the plan can change PBMs, the plans can have multiple PBMs, the end customers can choose different health plans. People often choose a health plan because of which doctors are in their network. So, in your view, it doesn't matter which one it is. They're both equally, I guess, agile in their ability to switch to another option? Yes. And the substitution doesn't have to be seamless. The question is, it's similar to the Queen City case, the Domino's Pizza case, where if you contractually restrict yourself by entering into a contract here, either the third-party plans signing up with Express Scripts or the end customers picking a health plan, your contractual restrictions doesn't become anti-competitive or anti-trust. In the Queen City case, it was the pizza place that does a Domino's franchise. It has to buy its supplies from Domino's. It entered into that exclusivity arrangement. It then can't turn around and say, oh, wait a second, now I'm stuck in this exclusive arrangement where I have to use Express Scripts mail order pharmacy. That all of a sudden becomes anti-competitive. Their argument, of course, is that they'll say that those contracts are entered into by employers and that the actual consumers of the pharmaceuticals in the end have little choice unless they're willing to incur exorbitant costs to go outside of the plan, that they're not involved in that bargain, that they are, in fact, captive. Does that make any difference at all? Well, I think, Your Honor, as this court recognized in Little Rock and as the First Circuit held in Stop and Shop versus Blue Cross, you do have to look at the market as the insured and the uninsured. In those cases, even the uninsured would have had to pay more for the services. But more importantly, I think it's also fair to say if they're talking about sort of the, it's hard to see where they're trying to fit that in, but if it's for the facts that would make it plausible that there was an abusive use of market power. Using their own percentages in the complaint, it suggests that express groups had about 30 percent of the market, which is not enough for finding market power. They cite Toys R Us from the Seventh Circuit and Visa, but there, those cases showed market power through direct anti-competitive effects, the raising of prices when you ordinarily wouldn't. There's no allegations whatsoever here that our mail order prices went up after they were excluded or anything of that sort. I'd like to turn back to the contract claims briefly. I think, Judge Kelly, as you recognize, the email response on the recredentialing does not suggest in any way that they're terminating the 2014 agreement. In fact, it's pursuant to the 2014 agreement, Section 2.2B of the 2014 agreement, that the recredentialing process even takes place. Why isn't that a fact issue? Well, because it's on the face of the contract. On the face of the 2014 agreement, on page JA82, 2.2B says credentials and recredentialing, that from time to time you're going to have to submit your recredentialing. While I strongly believe Judge White's inference was correct about what the purpose of the email response, we don't need to get there to defeat their novation claim. They themselves concede, I believe it's in footnote 5, that they're not alleging waiver or amendment of the original agreement because they know they would need something more for that. But instead, they're trying to allege that this two-sentence email, which if you look at JA87 to JA79, is from the Express Scripts Provider Credentialing Group, where the letter with the original contract is from the Express Scripts Contracting Department. But even putting that to the side, that this two-sentence email can somehow be an entirely new contract. It has to be viewed as terminating the prior contract and then entering into a totally new contract. There are no material terms in this contract. How long is it supposed to go for? What services are you providing? What rights and obligations does each party have under that agreement? None of that is contained in that. What they would have to show is that this one page, JA77, is in and of itself both a termination of the old contract and within its four corners a whole new contract. If what they're saying is, well, you were going to take most of the terms of the old contract but just waive some of them because of JA77, then they're outside of the novation world and they're back to amendment and waiver, which they themselves admit that they're not entitling to do. I think one of the things that's important that touched upon both the antitrust and the contract claims, the fact that Express Scripts didn't have to do business with them at all, this contract also had an end date. Within 15 months of the termination of the recredentialing, the contract would have expired or could have expired if the parties didn't automatically renew it. They have 90 days' notice for either party to get out of it. So this concept that they somehow relied on that email to enter into a whole new business, to invest millions of dollars, knowing that they might not have anything at the end of 15 months on its face is implausible and I think under Iqbal Twombly can be considered. I'll just briefly also touch upon unconscionability. As this court recognized in Phillips Petroleum and the Missouri Supreme Court recognized in the Amex case, there's nothing improper about enforcing unilateral termination rights. The Supreme Court of Missouri has also recognized in the Eaton case that a take it or leave it contract is not in and of itself unlawful. I think they're saying the additional above and beyond the take it or leave it is, if they leave it, there's nothing else for them, that this is really their only option to get into the network or to get into- Judge Kelly, one, they themselves said they were doing business with CVS. So putting aside the conclusory allegations of a conspiracy to kick them out of both, but they themselves were doing business with CVS. They themselves said that they developed this entire mail order business before submitting the re-credentialing. The re-credentialing says they're already doing 65% mail order without relying on the email. So somehow they were able to do this business. I would also like to point out, since my colleague pointed to the questionnaire, that the questionnaire at JA51 and the other pages he cited says they do 65% mail order. It does not say they're doing 65% of express business through mail order. So the fact that the questionnaire asks about how much mail order business they're doing is not some implicit waiver of the original agreement that allows them to do mail order. And again, they don't deny it. There is a no waiver provision in the contract because with 70,000 pharmacies, you can imagine that it sometimes takes time to catch up. Well, what is the impact on Park-Ermat to be out of this network? To be out of the... Express script. Well, one, if they had given up their mail order business, they wouldn't have been out of the retail network. But at the end of this original three-year contract, they might have been out of it anyway. So it's hard to know what the impact of it is. We heard today, not in the record, that they're on the verge or maybe out of business. But that would have happened at the expiration of the contract in any event. The contract was terminated with about a year left remaining in the contract. So it was only terminated about one year earlier than it would have had it expired. But I do think that... Can I just want to go back just for a moment? If you look at the claim that the email is a novated contract and it represents the novation and there really are no expressed terms in that novation. And so they want to read into it some implied terms rising out of the prior relationship. Isn't that by definition going to drive you straight into paragraph 7.9 on the anti-waiver provision inside the agreement? I mean, because if you have to start pulling out parts of the old agreement to understand what the terms and conditions are of the new agreement, aren't you really talking a modification or waiver as opposed to a novation? Because there's no real extinguishment to the prior agreement. A hundred percent, Judge Erickson. And if you don't do that, what you're left with is an email that says absolutely nothing about what its terms actually are. It can't be enforced. If you walked into a courtroom with that particular paragraph and says, here's my contract, judge, tell me what it means. What could a trial judge actually say it says? Judge Erickson, that is 100% correct. That they need to show somehow that the four corners of page JA-77 of that email is in and of itself a new contract and also terminates the old contract. They can't start picking and choosing and creating a Frankenstein bits and pieces from two different agreements because then they fall exactly as you said, Judge Erickson, into the no waiver, no amendment provision. And that is why I think Judge White correctly said, what they're doing here is saying, you've satisfied 2.2B. You've submitted your recredentialing information and you're going to continue, but continue under the 2014 rights and obligations. So they're sort of half arguing new contract, half arguing apparently that we sort of waived our rights because we must have known they were doing mail order. But they know they can't, as they recognize in footnote five, claim a waiver because the contract expressly excluded it. Thank you. I think I'd also like to conclude by saying this happens to be a case by one pharmacy under a very specific contract and respectfully submit that this is not the appropriate vehicle to alter existing antitrust law in a way that would disrupt the entire pharmaceutical benefits industry. That it really comes down to this specific arrangement, Park Hermat's failure to abide by its express obligations and Express Script's express use of the provisions that it contracted for when it chose to do business with Park Hermat in the first place. And for those reasons and the reasons in our brief will rest on the AWP and the other issues in our brief, we respectfully submit that Judge White's decision should be affirmed. Thank you. Very well. Your Honors, I'd like to just respond to Mr. Musoff in several points. I will try to be brief on each one because I have limited time. First of all, he stated that we didn't state that the contract, the 24 contract, 14 contract was illegal under the antitrust laws. That's absolutely wrong. That is one of our principal contentions, that it was either illegal under the conspiracy laws or illegal under unilateral acts. Two, the lock-in allegations that we discussed, Mr. Musoff was saying, well, it's actually very easy to switch for a consumer to another PBM. Those facts are outside the four corners of the complaint and cannot be considered. Three, he also talked about the fact that these drugs, these dermatological drugs are expensive and there needs to be special oversight with those drugs as opposed to others. Again, outside the four corners of the complaint should not be considered. Fourth, the leveraging question that Judge Erickson asked about. This is a tying arrangement, a negative tie. Tying law has been part of the jurisprudence of this country for a long time. In 1984, the Supreme Court said in Jefferson Parish, it is far too late in the history of our jurisprudence to say that tying is not only not a claim, but not per se illegal. So it is there. In Eastman Kodak, they talked about a negative tie, where if you're precluded from doing some things by virtue of being allowed to do some things, that can violate law. So that kind of theory exists. Is that pretty universally accepted, the negative tie, or is that something we'd have to step out into a little bit of uncharted territory? Well, it's the Supreme Court. It's Eastman Kodak versus Ermich Tackett. The Ninth Circuit has accepted it as well. Has this circuit or any other circuits given much guidance on it? I don't know if there's any much more guidance. You may have to go to the commentators for that, Your Honor. What's the exact service or product that Express Scripts de facto tied to their services as a PBM, when it required EIRMAT not to do business as a mail-order pharmacy? It allowed EIRMAT to provide retail pharmacy sales and to be reimbursed for retail pharmacy sales by the PBM of Express Scripts on the condition that it would not provide mail-order sales. Secondly, with respect to the Aspen Ski Theory, by the way, it's not only a tying claim, there's also a Section 2 claim here, a monopolization claim. Remember, one of the things that we've talked about is Express Scripts owns and operates a mail-order facility, the only one by PBM rule that it's allowed to mail-order to 85 million Americans. It has 100 percent of the from engaging in that activity. It is maintaining its monopoly in those services. Now, that comes to our single-brand market, and the single-brand market allegation is well accepted under CODAC and under various other cases that we cite from the Sixth Circuit, from the Ninth Circuit, et cetera, and it comes down to the lock-in situation. Go ahead, Judge. Excuse me. I was just curious. If we look at what the court said in Verizon v. Trinco and it talks about Aspen skiing being on the outer edges, my question is, which one of those cases is most applicable to our situation here and why? Actually, that's a good question. So it's definitely Aspen Ski because in Trinco there was never a relationship between the parties, right? So Trinco is inapplicable. Aspen Ski, there was a pre-existing contractual relationship that was entered into for a while, and then the relationship was terminated by the three mountains as opposed to, you know, with respect to the fourth mountain. So Aspen Ski is the precedent that is applicable here, 1985 Supreme Court. I think I'm out of time. You may complete your statement. Thank you very much, Your Honors. I appreciate it. So what I was going to say there is that my colleague here said, well, Aspen Ski is not applicable because there was no demonstration of increased prices. Direct evidence of market power is not only increased prices but the And here Express Scripts definitely has that power to exclude per the allegations of the complaint. Without Express Scripts, you can't do business. That's what we're saying. One last thing. I'd just like to end with this, Your Honors, because I know my time is up. Ask yourselves this. Why was that email sent? What was that email supposed to say? Can't be what Judge White said because it doesn't say what Judge White said. What would you have thought if you were Irma? You started mailing prescriptions in 2012. In 2014, you're provided with this contract that purportedly changes the terms of the relationship and takes aim at your business model. Then you tell truthfully what you're doing. You've raised the question. Thank you very much. Your argument is over. Thank you. Thank you, everyone. Thank you.